DECISION
{¶ 1} Relator, William T. Spinks, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting that compensation.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court grant a writ ordering the commission to vacate its order and, in a manner consistent with the magistrate's decision, enter a new order that adjudicates the PTD application. (Attached as Appendix A.) No objections to that decision have been filed.
 {¶ 3} Finding no error of law or other defect on the face of the magistrate's decision, and based upon an independent review of the evidence, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we grant a writ of mandamus ordering the commission to vacate its order of June 9, 2004, and, in a manner consistent with the magistrate's decision, enter a new order that adjudicates the PTD application.
Writ of mandamus granted.
McGrath and Travis, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. William T. Spinks, :
 Relator, :
 v. : No. 04AP-1230
Industrial Commission of Ohio : (REGULAR CALENDAR)
and P.I.E. Nationwide, Inc., :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on April 29, 2005 Philip J. Fulton Associates, and Jacob Dobres, for relator.
Jim Petro, Attorney General, and Shawn M. Wollam, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 4} In this original action, relator, William T. Spinks, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 5} 1. On April 16, 1985, relator sustained an industrial injury while employed as a dock/yard worker for respondent P.I.E. Nationwide, Inc. On that date, while opening a trailer door, relator tried to stop a box from falling to the ground. The industrial claim is allowed for "strain/slipped disc lower back; post laminectomy disc space narrowing at L5-S1," and is assigned claim number 883927-22.
 {¶ 6} 2. In March 1987, Paul F. Gatens, M.D., authored a report for the commission's rehabilitation center stating:
* * * Arrangements were made to have a stress MUGA on Friday, March 6th. Dr. Binkley, our Internal Medicine Consultant, talked to the cardiologist at Ohio State University about the stress MUGA, and it was the cardiologist's feeling that it was abnormal and that the MUGA fit the picture of an early cardiomyopathy. Our Internal Medicine Consultant, after talking to the cardiologist, recommended that we discharge the patient from the program and also recommended that he have a full cardiology workup. He was discharged on March 10, 1987, with a recommendation that he undergo a full cardiology workup for a possible cardiomyopathy. Be-cause of the question of cardiac problems very early in the program, at physician orders he was severely restricted in his activities and consequently the therapists were not really able to do a full evaluation of him in the short time that he was in the program. He did have one episode in the program of light-headedness and dizziness which was associated with some nausea, but this only lasted a short time.
* * *
Because of the possible early cardiomyopathy diagnosed from a stress MUGA, it was recommended that he see a cardiologist when he got home to have a full cardiology evaluation. Because of the question of the cardiomyopathy, he was discharged from the Chronic Pain and Stress Program for medical reasons on March 10th.
 {¶ 7} 3. In July 1988, relator underwent a laminectomy and decompression with excision of the L5-S1 disc.
 {¶ 8} 4. In July 1989, relator underwent another surgery described as "[d]ecompression laminectomy; laminotomy L5; medial facetectomy; transverse process fusion, L4 to sacrum; Wiltse pedicle segmental stabilization, L4 to sacrum; iliac bone graft."
 {¶ 9} 5. In August 1990, relator underwent a third surgery to remove the pedicle screws and rods.
 {¶ 10} 6. By letter dated March 24, 1992, the rehabilitation division of the Ohio Bureau of Workers' Compensation ("bureau") informed relator:
Recently you were referred to the Rehabilitation Division of the Ohio Bureau of Workers' Compensation Ohio.
The Rehabilitation Division is designed to assist industrially injured workers in their return to gainful employment. Our personnel will work with you and your physician to develop a rehabilitation plan to help you attain your return to work goal. This is a voluntary program.
Enclosed is a brochure describing our program for your review. After reviewing the brochure, I encourage you to contact me so we can discuss the program in further detail. Please contact me within 10 working days * * *.
If I receive no reply from you by April 8, 1992, I will assume you are not interested in rehabilitation services at this time and your Rehabilitation file will be closed. * * *
 {¶ 11} 7. By letter dated April 13, 1992, the bureau's rehabilitation division informed relator:
You have been referred to The Ohio Bureau of Workers['] Compensation, Rehabilitation Division for consideration for rehabilitation services.
The Rehabilitation Division is a voluntary program designed to assist industrially injured persons in their return to work efforts. Enclosed you will find a brochure which outlines the program and briefly explains the goals and services offered by this agency. If you are interested in learning more about these rehabilitation services and goals, please contact me by April 30, 1992 * * *.
 {¶ 12} 8. On October 8, 1992, relator filed his first of four PTD applications.
 {¶ 13} 9. By letter dated January 11, 1993, the bureau's rehabilitation division informed relator:
I am writing to inform you that I will be closing your case effective January 8, 1993. I have not heard from you for the past 6 months and my attempts to get a hold of you have not been successful. Additionally, I am told by the evaluations staff of the J. Leonard Camera Center that you would need to get a cardiologist release if interested in re-referring yourself for services. * * *
 {¶ 14} 10. Following a July 14, 1994 hearing before two staff hearing officers ("SHO"), the commission denied relator's first PTD application.
 {¶ 15} 11. On April 12, 1996, relator filed his second PTD application. Following a January 2, 1997 hearing before an SHO, the commission denied the second PTD application.
 {¶ 16} 12. On September 28, 2000, relator filed his third PTD application. Following a March 6, 2001 hearing before an SHO, the commission denied the third PTD application.
 {¶ 17} 13. The record contains a bureau "Vocational Rehabilitation Closure Report" dated May 20, 2003, stating:
* * * Thomas Spinks was referred to MedProSolutions for vocational rehabilitation services on April 17, 2003 by MCO nurse case manager Laura Hotchkiss. The purpose of this referral was to determine feasibility for services and to coordinate return to work options. Initial contact occurred on April 21, 2003 via introductory letter. Telephone contact occurred on April 23, 2003. At that time, Mr. Spinks indicated he was interested in services but was unclear of a vocational goal. He is currently retired, receiving SSI and providing childcare services for his grandchildren. It was also determined that he did not have a POR. Follow-up contact occurred with the AOR per Mr. Spinks['] request. The attorney indicated a POR would be established for Mr. Spinks if he chose to proceed with vocational services. After several unsuccessful telephone follow-up attempts with Mr. Spinks, a contact letter was mailed on May 6, 2003. Telephone contact occurred with him on May 20, 2003. He reported new medical concerns with his eyes that might require surgery or other medical intervention. Based on medical concerns not related to the claim, it was mutually agreed to proceed with case closure at this time.
The rehabilitation file was staffed with the MCO nurse case manager and BWC DMC. It was mutually agreed to proceed with case closure due to medical instability. The rehabilitation file was closed effective May 20, 2003.
 {¶ 18} 14. By letter dated May 20, 2003, relator was informed that his rehabilitation file with MedProSolutions was closed.
 {¶ 19} 15. On November 12, 2003, relator filed his fourth PTD application, the adjudication of which is at issue in this action.
 {¶ 20} 16. On March 11, 2004, relator was examined at the commission's request by James Rutherford, M.D. In his report, Dr. Rutherford opined that the industrial injuries produce a 25 percent permanent partial impairment of the whole person and that the industrial injuries limit relator to sedentary work.
 {¶ 21} 17. The commission requested an employability assessment report from Beal D. Lowe, Ph.D. The Lowe report, dated July 10, 2004, indicates that there are no employment options when Dr. Rutherford's medical restrictions are accepted.
 {¶ 22} 18. Following a June 9, 2004 hearing, an SHO issued an order denying the fourth PTD application. The SHO's order states:
This order is based particularly upon the report of Dr. Rutherford.
The claimant was injured on 04/16/1985. On that date the claimant injured his low back as a result of trying to stop a falling box from hitting the ground. The claimant last worked in 1988. He has undergone three low back surgeries, otherwise, treatment has been conservative.
Based on Dr. Rutherford's report the claimant has the residual capacity to perform sedentary employment. Considering that the claimant can perform sedentary work, it is next necessary to review his disability factors to determine what impact those factors have on claimant's ability to perform sedentary work.
In that light the claim file reveals the following disability factors. The claimant is 69 years old (he was 53 when he last worked in 1988), he has an eleventh grade education, and he has worked as a dock/yard worker, truck driver, tow truck driver/owner, and plant worker.
The claimant's age is viewed as of the time he last worked when he was 53 years old. The claimant's age is viewed as of when he last worked at 55 because the claimant's full potential to obtain or be retrained for sedentary work can only be truly measured from the point he last worked rather than his present age.
Consequently, at age 53, the claimant at that point in time would have been considered a middle age[d] person who potentially would have had at least twelve years left in the work force to acquire the skills necessary to perform sedentary work. In that light, the claimant's age is not viewed negatively.
The claimant's education, eleventh grade, would at first impression seem to be a negative factor. However, it is pointed out that per claimant's IC-2 application he possesses basic literacy skills and a review of the file reveals that prior testing demonstrated that claimant had average intelligence. Therefore, because claimant has average intelligence plus basic literacy abilities, it is reasonable to conclude that he has and had the skills necessary to acquire sedentary work skills if he was so motivated.
Claimant's work history has all been in the non-sedentary field, therefore, he has no transferable skills for sedentary work. However, while claimant does not have immediately transferable skills for sedentary work, it is nevertheless found that claimant had he been so motivated, could have acquired sedentary job skills.
The conclusion that the claimant could have developed sedentary job skills is based on claimant's prior rehabilitation history. The claimant was examined by Dr. Gatens on behalf of the Bureau of Workers' Compensation Rehabilitation Division in 1987. Dr. Gatens opined that the claimant should be admitted to a chronic pain and stress program. Unfortunately, due to a non-industrial cardiac condition the claimant discharged from the Rehabilitation Division at that time. The claimant was recontacted by the Rehabilitation Division in 1992. His rehabilitation file was closed per a 01/11/1993 letter from Larry Barker, a case manager for the Rehabilitation Division. Mr. Barker stated in that letter that because the claimant has not contacted him for the past six months, his file would be closed. Mr. Barker also mentioned that the claimant would need a cardiologist release if he desired to participate in rehabilitation. The claimant at hearing denied being contacted by Mr. Barker in 1992 or 1993, but there is no objective proof (no evidence of returned letters) that the claimant was not so contacted.
Therefore, it is found that the claimant knowingly refused offers of rehabilitation for unknown reasons. This failure to undergo a retraining program so that the claimant could qualify for work within his residual capacity is important based on the following case law precedents. InSpeelman v. I.C. (1992), 73 O.App3d 757 it was held that the Commission may consider not only past employment skills but those skills which may be reasonably developed, and may consider the failure of a claimant to undergo rehabilitation or retraining that would permit the claimant's return to work. Similarly, in B.F. Goodrich Co. v. I.C. (1995),73 O.St.3d 525 the court held that a claimant's lack of participation in retraining does not necessarily translate into an inability to be retrained. Bowling v. National Can Corp. (1996), 77 O.St.3d 148, stated that it demands a certain level of accountability of a claimant, who despite the time and medical ability to do so, never tried to further his education or learn new skills when there was ample opportunity to do so.
In summary, because it has been found that at least as of January, 1993, when the claimant was 58 years old, that he possessed the time and basic literacy ability to be potentially retrained for work within his residual capacity, that his failure to pursue such retraining precludes a finding that eleven years later, at age 69, he should be declared permanently totally disabled.
(Emphasis sic.)
 {¶ 23} 19. On November 15, 2004, relator, William T. Spinks, filed this mandamus action.
Conclusions of Law:
 {¶ 24} The main issue is whether the commission abused its discretion in finding that relator failed to pursue rehabilitation or retraining and that such failure is grounds to deny the PTD application.
 {¶ 25} Finding that the commission abused its discretion, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 26} To begin, it is well-settled that nonallowed medical conditions, even disabling nonallowed medical conditions, cannot be used to advance or defeat an application for PTD compensation. State ex rel.Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452. If relator's cardiac condition prevents his participation in rehabilitation or retraining programs, his failure to participate in such programs cannot be used to defeat his PTD application.
 {¶ 27} In March 1987, as previously noted, Dr. Gatens authored a report for the commission's rehabilitation division stating that relator was discharged from the chronic pain and stress program for medical reasons, i.e., a possible diagnosis of early cardiomyopathy. It was recommended that relator undergo a "full cardiology workup." However, the commission did not offer to provide a full cardiology workup.
 {¶ 28} The SHO addressed the March 1987 discharge in his order.
 {¶ 29} As previously noted, in March and April 1992, the bureau's rehabilitation division mailed relator two letters that invited him to contact the rehabilitation division regarding its services. A brochure was enclosed with each letter. Apparently, relator never responded to the two letters. Consequently, by letter dated January 11, 1993, relator was informed by the bureau that his case was being closed. Additionally, relator was informed that he would need a release from a cardiologist if he wished to obtain services. However, the bureau did not offer to provide relator a cardiologist examination in order to obtain such a release.
 {¶ 30} Relying primarily on relator's failure during 1992 to respond to the bureau's invitations, the SHO found that relator "knowingly refused offers of rehabilitation for unknown reasons." Citing State exrel. Speelman v. Indus. Comm. (1992), 73 Ohio App.3d 757, State exrel. B.F. Goodrich Co. v. Indus. Comm. (1995), 73 Ohio St.3d 525, andState ex rel. Bowling v. Natl. Can Corp. (1996), 77 Ohio St.3d 148, the SHO concluded that relator's failure to pursue retraining or rehabilitation precludes a finding at his present age of 69 that he is permanently and totally disabled.
 {¶ 31} While it is the commission that weighs the evidence, it cannot draw an inference from evidence that the evidence fails to support. Here, the commission inferred from relator's failure to respond to the bureau's letters of March and April 1992, that the reasons for such failure were "unknown" and given that the reasons were unknown, a negative inference could be drawn as to relator's physical ability and desire to undergo rehabilitation or retraining. In effect, relator's PTD application was denied because he failed to respond to the bureau's March and April 1992 letters or to otherwise provide a reason on the record for his refusal to seek rehabilitation in 1992.
 {¶ 32} In order to draw a negative inference from relator's failure to respond to the March and April 1992 letters, an inference used to justify denial of the PTD application, the SHO had to discount the undisputed fact that relator had previously been discharged from the commission's rehabilitation program in 1987 for cardiac reasons and that, even in 1992 or 1993, the bureau's rehabilitation division would not have provided services until relator obtained a release from a cardiologist.
 {¶ 33} Significantly, the bureau did not offer to provide a cardiologist to examine relator so that he might be released for rehabilitation services. It is also significant that the bureau has no information indicating that relator's cardiac condition had improved since 1987.
 {¶ 34} In short, the evidence of record that the SHO relied upon to support a finding that relator unjustifiably failed to pursue rehabilitation, does not support the SHO's finding. Relator's apparent failure to respond to the bureau's letters does not support an inference that relator had no justification for not pursuing rehabilitation in 1992.
 {¶ 35} Moreover, the cases cited by the SHO do not support the proposition that the SHO can draw a negative inference from the evidence to support a finding that relator unjustifiably refused to pursue rehabilitation. Nor do other cases known to this magistrate dealing with rehabilitation efforts support the SHO's finding. See State ex rel. Woodv. Indus. Comm. (1997), 78 Ohio St.3d 414, State ex rel. Wilson v.Indus. Comm. (1997), 80 Ohio St.3d 250, and State ex rel. Cunningham v.Indus. Comm. (2001), 91 Ohio St.3d 261.
 {¶ 36} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its SHO's order of June 9, 2004, and, in a manner consistent with this magistrate's decision, enter a new order that adjudicates the PTD application.